Mr. Justice James
delivered the opinion of the Court:
The complainants seek to establish a right of inheritance to certain lands in this District as heirs of T. Lawrason Riggs. As the case stands on demurrer to their petition the facts are, for the purposes of our consideration, as therein stated.
The parents of the complainants intermarried on the 12th day of March, 1872. Their father was Louis de GeofFroy, who was born in France, and was, at the time of the birth of each of them, a citizen and subject of France and an officer in the diplomatic service of the French Government and has always been domiciled in France. At the time of her marriage with their father their mother was Kate S. Riggs, who was a citizen of the District of Columbia, wherein she was born, and of the United States. The complainant, George Louis Dominique Antoine de GeofFroy, was born on the 14th day of June, 1873, at Pekin, in China, while his father was French minister plenipotentiary to that country and was residing there only as such minister, and the -complainant, Jules Frangois George dé GeofFroy, was born on the 18th day of October; 1875, at Cannes, in France. Their mother was a sister of T. Lawrason Riggs, whose heirs they claim to be, and of all the defendants, except Medora, wife of the defendant, E. Francis Riggs. She departed this life on the 7th day of February, 1881, and T. Lawrason Riggs departed this life on the 19th day of January, 1888, unmarried and intestate. The defendants, E. Francis, Alice L., and Jane A. Riggs, are, and have always been, citizens of the United States and of the District of Columbia; and the defendant, Cecelia Howard, while a citizen of the United States and of said District, intermarried with Henry Howard, *341 who was then, and has always been, a British subject, and has since that time resided with him in England. The bill' describes the real estate of which T. Lawrason Riggs died seized, and claims that the complainants, his nephews, are co-heirs with the brother and sisters of the decedent.
By the common law, as it existed in Maryland and was continued and established in this District, aliens were incapable to hold lands here. Buchanan vs. Deshon, 1 Har. & G., 289; Guyer’s Lessee vs. Smith, 22 Md., 347. It follows that they can have that capacity only by some positive enabling concession granted by the sovereignty of the soil. We have only to inquire, therefore, what concession to aliens now exists. . -
By the sixth section of the Act of Maryland of 19th December, 1791, ratifying her cession of the Territory of Columbia to the United States, it was enacted :
“That any foreigner may, by'deed or will hereafter to be made, take and hold lands within that part of the said territory which lies within this State in the same manner as if he was a citizen of this State, and the same lands may be conveyed by him and transmitted to and be inherited by his heirs and relations as if he and they were citizens of this State: Provided, That no foreigner, shall, in virtue hereof, be entitled to any further or other privilege of a citizen.”
By virtue of this provision lands acquired by an alien by deed or will were inheritable by his. alien heirs. It was immaterial that after such acquisition, he became a citizen; his lands were still of the class of lands which were inheritable by alien heirs. But, as this law did not provide that lands acquired by a citizen should be inheritable by alien heirs, their capacity in such cases was left as at common law, and by that law they could not hold, and therefore could not take such lands. Spratt vs. Spratt, 1 Peters, 343; 4 Id., 393.
Inasmuch as the decedent in this case had always been a citizen of the United States and of the District of Columbia, and therefore had acquired his lands as a citizen, the *342 ■complainant could not derive from this statute any capacity to inherit them, but were, on the contrary, denied such capacity by the still existing common law.
The law, and the consequent incapacity of the complainants, stood thus when a consular convention with France was concluded on the 23d of February, 1853. The next question, then, is whether they derived from this convention the capacity to inherit from a citizen. Its seventh article was in the following words:
“ In all the States of the Union, whose existing laws permit it, so long and to the same extent as the said laws shall remain in force, Frenchmen shall enjoy the right of possessing personal and real property by the same title and in the same manner as the citizens of the United States. They shall be free to dispose of it as they may please, either gratuitously or for value received, by donation, testament or otherwise, just as those citizens themselves; and in no case shall they be subjected to taxes on transfer, inheritance, or any others different from those paid by the latter, or to .taxes which shall not be equally imposed.
“As to the States of the Union, by whose existing laws aliens are not permitted to hold real estate, the President engages to recommend to them the passage of such laws as may be necessary for the purpose of conferring this right.
“In like manner, but with the reservation of the ulterior right of establishing- reciprocity in regard to possession and inheritance, the Government of France accords to the citizens of the United States the same rights within its territory in respect to real and personal property and inheritance as are enjoyed there by its own citizens.”
This article presents several interesting questions of construction, but the only one that is relevant to the present inquiry is, whether it applies at all to the District of Columbia and the Territories of the United States. It can only be made to do so by interpreting the word States as used in a sense which is consistent with the context. The *343 States indicated are manifestly political bodies which have an independent power to make laws for themselves. It is with reference to this power that they are grouped in two classes: One of them, including those States which, by their own laws, had already conceded certain capacities to aliens; the other, those States which had. not done so. The stipulations of the United States were appropriate in relation to such bodies, and were inappropriate to places which were, as to the matter in hand, wholly under the control of the Government of the United States. If in any of the latter the desired laws did not already exist, the United States would hardly engage to address them in terms of recommendation and request. Whether we consider, then, the mere words or the operation of this article it seems plain that it was not intended to apply to the District of Columbia or to the Territories of the United States.
If it seems remarkable that the «very places which were wholly subject to the United States, in the matter of land tenure, should be omitted from a convention of reciprocity with a country which opened the whole of its dominions to our citizens, it is possible to suggest reasons which may have determined the course of our own Government. It may have appeared to be unnecessary to include the District of Columbia, inasmuch as its local law, already by affirmation a law of the United States, had secured to all aliens the capacity to acquire lands by purchase, and the capacity to inherit lands from alien purchasers. As to the Territories, it will be remembered by those who can recall the political contests of that period, that the settlement of these prospective States had become the subject of extreme sensibility. Whatever should determine the character of their populations might thereby determine their relation to a subject of intense antagonism. It is not improbable, therefore, that the United States declined to regulate the subject of land tenure in the Territories by this convention, because it would not, in effect, deal with a foreign power concerning its own political future. ■
*344 But whatever may have been the reasons for that omission, we are of the opinion that the District of Columbia and the Territories were intentionally omitted from the treaty of 1853. It follows that no enlargement of the capacity of inheritance which had already been granted to aliens by the Maryland Act of 1791, can be derived from this treaty. Aliens were still incapable, therefore, to inherit lands in this District acquired by citizens, when the act of Congress, relating to the acquisition and holding by aliens of lands in the Territories of the United States and in the District of Columbia was passed on the 3d of March, 1887. The next question which we have to consider, then, is whether that act conceded to aliens the capacity to inherit from citizens of the United States.
Its first section provides, “that it shall be unlawful for any person or persons not citizens of the United States, or who have not lawfully declared their intention to become such citizens, or for any corporation not created by or under the law's of the United States or of some State or Territory of the United States, to hereafter acquire, hold or own real estate so hereafter acquired, or any interest therein, in any of the Territories of the United States or in the District of Columbia, except such as may be acquired by inheritance, or in good faith in the ordinary course óf justice in the collection of debts heretofore created; Provided, that the prohibition of this section shall not apply to cases in w'hich the right to hold or dispose of lands in the United States is secured by existing treaties to the citizens or subjects of foreign countries, which rights, so far as they may exist by force of any such treaty, shall continue to exist so long as such treaties are in force, and no longer.”
It is claimed, on the part of the petitioners, that the words, “ except such as may be acquired by inheritance,” have an enabling operation, and confer upon aliens the right to acquire lands in the District of Columbia by inheritance from citizens of the United States.
*345 This exception is an inartificial statement of intention, whatever that intention may have been; but it is a matter of judicial observation that this is not the form in which a new grant is usually expressed, while it is not unusual to express in this way an intention to exclude from the operation of the general rule, already set forth in the statute-, some existing matter and to leave that matter subject to the existing law.
As a fact, laws relating to the subject of alien heirs did then exist both in the District of Columbia and in the Territories. There was, therefore, something to save and continue, if such was the intention of this exception. In this District, as we have seen, the Act of 1791 gave to aliens the capacity to inherit from alien purchasers, and the common law denied them the capacity to inherit from citizens. In Dakota (Rev. Code, 1887, Section 3417), in Washington Territory (Code 1881, Section 2419), and in Wyoming (Rev. Stat. 1887, Section 2227), the capacity of an alien to inherit real estate was rendered that of a citizen of the United States. •In Idaho (Rev. Stat., 1887, Section 5715), and Montana (Compiled Stat., 1887, p. 400), the like capacity was conferred upon “ resident aliens,” but no non-resident foreigner could take by succession, unless he appeared and claimed by succession within five years after the death of the decedent from whom he claimed. And in Arizona (Rev. Stat., 1887, par. 1742), though an alien might take land by devise or descent, yet in either case, to avoid forfeiture and escheat of the property he must, at the end of five years (in the absence of treaty provisions), either become a citizen of the United States or make sale of the land, unless, by the laws of the country to which the alien belonged, the citizens of the United States were there permitted to take and hold lands by devise or descent.
Now, the exception in question might operate to exclude lands hereafter acquired by inheritance under any of these laws from the general prohibition against acquiring them *346 at all, without attributing to its language any unusual sense or effect. The same observation may be made concerning the next clause of the exception, which includes lands hereafter acquired in good faith in the ordinary course of justice in the collection of debts heretofore created.. Indeed this clause is even more suggestive than the other of a reference to existing laws. The restriction to d ebts heretofore created strongly implies that it was proceedings for their collection, authorized by existing laws, which were to be saved by this exception. Its obvious purpose was to avoid impairing the obligation of contracts by taking away any part of the means of collection already secured to alien creditors in common with other creditors.
If,-under the three existing laws, an alien creditor had a right not only to a judicial sale of his debtor’s land, but, in order to save himself, to become a buyer at such sale, it would, certainly be an impairment of -the obligation of his contract to take from him that capacity to purchase. Whatever may be said of the mere power of the United States to do what the States are forbidden to do in that respect, it must be assumed by the courts that the United States always proposes to be bound by that rule. It was imperative, therefore, that a clause having the very effect which we impute to this exception — namely, to save the operation of existing laws touching the collection of debts already contracted — should be inserted in this prohibitory statute.
If this exception was a saving of rights secured by then . existing laws relating to the collection of debts, it seems necessarily to follow that it must also be a saving of existing provisions for alien inheritance. However different the reasons applicable 'to the two subjects, they seem to be so connected in this exception that its office in both cases must be the same. We think that if it was not intended to be a grant of a new right or capacity in one of these cases, but only a saving of an existing status, it must be so treated in the other.
*347 In conclusion, it is to be observed that the concession of a new capacity to aliens hardly seems consistent with the temper and circumstances of this legislation or with its denial for the future of a hospitality which had been extended here since the establishment of the seat of Government. On the other hand, a design to save from this sweeping denial the capacity of. an alien purchaser’s kindred to inherit the land which he had already acquired seems to be entirely consistent even with.the temper of this law. To do 'so was actually a requirement of good faith. To the practical sense of such a purchaser the capacity of his .kindred to inherit his purchase must have seemed to be one of the elements of its value and even to have been bought with the land. Since aliens had been allowed to acquire lands here with a long-standing assurance that their home kindred might inherit them, it was but an act of good faith to keep that promise, and it was, we think, for that purpose that this exception was made, and not for the purpose of granting what had so long been denied.
The demurrer to the bill is sustained.